**MARRIOTT SENIOR LIVING SERVICES, INC., et al.**
**Plaintiffs,**

**v.**

**SPRINGFIELD TOWNSHIP,**
**Defendant.**

**No. Civ.A. 97–3660.**

United States District Court,
E.D. Pennsylvania.

Dec. 7, 1999.

Ronald P. Schiller, Piper and Marbury, Phila, PA, Joseph Kernen, Piper and Marbury, Philadelphia, PA, Beth Pepper, Stein and Schonfeld, Baltimore, MD, for Marriott Senior Living Services, Inc., plaintiff.

William F. Holsten, II, Holsten & White, Media, PA, Paola F. Tripodi, Holsten & White, Media, PA, Andrew J. Bellwoar, Media, PA, for Springfield Township, Delaware County, PA, defendant.

## OPINION

EDUARDO C. ROBRENO, District Judge.

## I. INTRODUCTION

Marriott Senior Living Centers, Inc.

("Marriott")[1] seeks to build a large, multi-unit senior assisted living[2] facility in Springfield Township, Delaware County, Pennsylvania ("Township"). For a site, Marriott has chosen an area zoned "A" Residential under the Township's Zoning Code, which principally permits single-family detached homes to be built in that area. In order to build the senior assisted facility on the chosen site, Marriott has requested that the Township grant a reasonable accommodation under the Fair Housing Act ("FHA"). Marriott claims that the Township has failed to grant its request. It is Marriott's theory of liability that, in doing so, the Township has violated the FHA by: 1) failing to make a reasonable accommodation to its proposal; 2) maintaining a zoning scheme which is facially discriminatory towards elderly people with disabilities; and 3) maintaining a zoning scheme which has a disproportionate impact on elderly people with disabilities. In addition, Marriott asserts that the Township has violated the Americans with Disabilities Act (ADA) by maintaining a zoning scheme that segregates elderly people with disabilities from living in the community of their choice.

The Township responds that, while Marriott has made informal inquiries of Township officials, it has never formally submitted its proposed plan for review by the appropriate Township authorities. Nor has Marriott sought variances or other relief from the Township's Zoning Code. Accordingly, the Township argues that Marriott's claims that it was not granted a reasonable accommodation and that the zoning scheme disproportionately impacts upon elderly persons with disabilities are not final decisions which are ripe for judicial review. Further, the Township contends that the claim that the zoning scheme is facially discriminatory lacks merit as a matter of law.

Marriott has moved for summary judgment on all these claims.[3] In turn, the Township seeks dismissal of Marriott's reasonable accommodation and disparate impact claims as unripe for judicial review and judgment as a matter of law on the facial discrimination claim.[4]

1. C.C. Hancock United Methodist Church, and George R. Denison and Barbara Denison (collectively the "Plaintiffs") are also plaintiffs in this case.

2. "Senior assisted living" facility is a term increasingly used throughout the country and the health care industry to refer to "supportive living arrangements for elderly people who can no longer live safely on their own, and who, because of mental and/or physical impairments, need assistance with activities of daily living in a 24–hour supervised setting, but do not need skilled nursing care." Pls.' Mem. in Supp. of Summ.J. at 6.

3. Neither Marriott nor the Township has sought summary judgment on the claims under § 504 of the Rehabilitation Act (Count 2) or under the Equal Protection Clause (Count 4).

4. The Third Circuit has recognized that "[b]ecause ripeness affects justiciability ... unripe claims should ordinarily be disposed of on a motion to dismiss, not summary judgment." *Taylor Inv., Ltd. v. Upper Darby Township*, 983 F.2d 1285, 1290 (3d Cir.1993). However, the court concluded that when a district court is confronted with premature claims on review of summary judgment, the district court should treat the motion as a motion to dismiss. *Id.* Defendant has asserted ripeness as an affirmative defense in its Answer (doc. no. 50), but did not raise this issue in its motion to dismiss (doc. no. 37). In accordance with *Taylor*, this court will treat defendant's motion for summary judgment on Marriott's reasonable accommodation claim as a motion to dismiss for lack of subject matter jurisdiction. *See* Fed.R.Civ.P. 12(b)(1).

The court will review the remaining claims, the facial discrimination and disparate impact claims, under the summary judgment standard. *See* Fed.R.Civ.P. 56(c). Summary judgment is appropriate if the moving party can "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.* When ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The court finds that: 1) since Marriott has not afforded the Township the opportunity to meaningfully consider a formal proposal, to hold hearings at which the public and others affected by the project were afforded the opportunity to comment, and to state in writing the reasons for its decision, any decision made by the Township on Marriott's reasonable accommodation claim is not final, and therefore, Marriott's reasonable accommodation claim is not presented in sufficiently concrete terms to permit judicial review; 2) the Township's zoning scheme challenged by Marriott does not on its face discriminate against elderly persons with disabilities; and 3) there is a genuine issue of material fact as to whether the challenged zoning scheme, as applied, disproportionately impacts elderly people with disabilities because the Township has never previously ruled on an application for relief from the zoning code to allow an assisted living center in an "A" residential area and in the instant case, Marriott has not submitted a formal application for approval.

## II. FACTS

### A. *Springfield Township's Land–Use Procedures.*

Land-use planning and the enactment of land-use restrictions are some of the most important functions performed by local government. *See, e.g., FERC v. Mississippi,* 456 U.S. 742, 768 n. 30, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982) ("regulation of land use is perhaps the quintessential state activity"); *Village of Belle Terre v. Boraas,* 416 U.S. 1, 13, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974) (Marshall, J., dissenting) ("[zoning] may indeed be the most essential function performed by local government"). In Pennsylvania, local governing bodies of every municipality are empowered by statute, the Pennsylvania Municipalities Planning Code, to enact regulations, controls and procedures which govern land-use planning. *See* 53 Pa.Cons.Stat.Ann. § 10101–11202 (West 1997); *see also* 1 Robert M. Anderson, *Law of Zoning in Pennsylvania* § 2.04 (1982). It is pursuant to this delegated authority from the Commonwealth, that Springfield Township enacted its zoning code and zoning ordinances.

In Springfield Township, two sections of the Springfield Township Code guide and control land development within the Township—the Springfield Township Zoning Ordinance of 1985 (Chapter 143) ("Zoning Ordinance") and the Springfield Township Subdivision and Land Development Ordinance of 1987 (Chapter 123) ("S & L Ordinance") (collectively "Zoning Code").

The S & L Ordinance outlines in detail the two steps every applicant must satisfy to obtain approval of a subdivision and/or land development. First, the applicant must submit, for approval by the Township Planning Commission and the Township Board of Commissioners, a Preliminary Plan. *See* S & L Ordinance § 123–12. Section 123–12 lists the requirements of the Preliminary Plan, as well as the procedures that must be followed in submitting the plan.[5] Furthermore, if the proposed subdivision or land development requires a conditional use permit or special exception, the S & L Ordinance provides the following regulation:

> Whenever a conditional use permit or special exception is required by the Zon-

---

5. For example, the section provides for, in relevant part: the number of copies and format of the application and blue prints required (§ 123–12(A)–(B)); the date the Preliminary Plan shall be submitted to the Township Planning Commission (§ 123–12(C)); the procedure for the Planning Commission's review of the plan and submission of its report to the Board of Commissioners (§ 123–12(D)–(E)); the procedure for the Board of Commissioners' review of the Planning Commission's report, including the option for public hearings (§ 123–12(F)–(H)); and the procedures for and requirements of the Board of Commissioners' decision (§ 123–12(J)–(L)). Each of these procedures are based upon the Pennsylvania Municipalities Planning Code. *See* 53 Pa.Cons.Stat.Ann. §§ 10101–11202 (West 1997).

ing Ordinance for any use proposed or inherent in any proposed subdivision and/or land development, all applications therefor shall be filed and all plans, documents and other submissions required to accompany same shall be filed with the township after filing for review of a preliminary plan for subdivision and/or land development.

*See id.* § 123–10(B). Thus, to obtain approval of any proposed Preliminary Plan, an applicant is required to file, at a minimum, a Preliminary Plan in accordance with section 123–12, along with an application for a conditional use permit if necessary, as outlined by the Zoning Ordinance.[6] Within six months after the Preliminary Plan is approved, the applicant must next submit a Final Plan. *See id.* § 123–13(A).[7] The requirements and procedures for approval of a Final Plan are enumerated in section 123–13.[8]

The S & L Ordinance also provides a procedure for "an informal discussion between the Planning Commission and the landowner" prior to the submission for Preliminary Plan approval. *See id.* § 123–11. While this non-mandatory section of the ordinance is not an alternative to the submission of a formal plan pursuant to section 123–12, it does provide assistance to the applicant in pursuing a proposed land development plan by allowing an applicant to test its proposal without incurring the increased costs and time associated with the submission of formal Preliminary and Final Plans. *See, e.g., Board of Commissioners of Abington Township v. Quaker Constr. Co.,* 65 Pa.

Cmwlth. 8, 441 A.2d 801, 802–03 (1982) (recognizing that informal Sketch Plans may be mandatory or non-mandatory, and when mandatory, township must comply with all provisions of the Pennsylvania Municipalities Planning Code, including notice provisions); *Mid–County Manor Inc. v. Haverford Township Bd. of Commissioners,* 22 Pa.Cmwlth. 149, 348 A.2d 472, 476 (1980) (same). This non-mandatory and informal discussion section provides, in pertinent part, as follows:

A sketch plan for any proposed subdivision and/or land development may, at the option of the landowner or developer, be submitted to the Township Planning Commission for review. The submission of a sketch plan does not constitute submission of an application for approval of a subdivision and/or land development plan. However, it does represent a basis for an informal discussion between the Planning Commission and the landowner or developer which may prove to be valuable to the prospective applicant in formulating plans, documents and other submissions for preliminary plan approval.

*Id.* § 123–11. In addition, this section further provides the procedures and requirements for submitting a Sketch Plan. *See id.* § 123–11(A)–(E). Although the requirements and procedures are similar to those of the Preliminary and Final Plans, there are a few major differences. For instance, the informal Sketch Plan is only reviewed by the Planning Commission and not the Board of Commissioners; section 123–11 does not provide procedures for

---

**6.** It should be noted that the S & L Ordinance also provides that "[a]ll preliminary and final plans shall be submitted, along with all required reports, feasibility studies and other documentation, and with the required application form and fees ... [and] ... no application shall be considered to be *complete* until all required papers and checks have been submitted." *Id.* § 123–10(D) (emphasis added).

**7.** A Final Plan may not be required, however, if the Planning Commission concludes that the Preliminary Plan meets all the require-

ments of a Final Plan and recommends to the Board of Commissioners that the Preliminary Plan be considered as a Final Plan. *See* § 123–12(I). Clearly this is not the case here.

**8.** These procedures and requirements are very similar to those of the Preliminary Plan. The Final Plan is also initially reviewed by the Township Planning Commission. The Commission then prepares a report for the Board of Commissioners, who then make a decision on the Final Plan. *See id.* § 123–13(A)–(R).

public hearings after public notice; and the procedures for denying an informal Sketch Plan are not outlined. Furthermore, both the Preliminary Plan and Final Plan applications require a significantly increased number of submissions in the form of supporting documents and other data than does the informal Sketch Plan. *Compare* § 123–20 (Preliminary Plan Requirements) and § 123–23 (Final Plan Requirements) *with* § 123–19 (Sketch Plan Requirements). The different procedures associated with the non-mandatory and informal Sketch Plan discussions and the formal Preliminary and Final Plan submissions illustrate that the sketch Plan was not intended as mechanism for obtaining a final decision from the local government concerning its interpretation of its zoning code and ordinances.

B. *Marriott's Steps to Obtain Approval of Its Proposed Development.*

Beginning in August of 1995, Marriott began the process of obtaining zoning and land development approval for a proposed senior assisted living residence known as Brighton Gardens (hereinafter "Project"). Pls., Mem. for Summ.J. at 309; *see also* Aff. of Joseph A. Damico, Jr., Esq. ¶ 4 ("Damico Aff."). Marriott proposed to build the project in an area zoned "A" Residential under the Zoning Code.[9] According to Marriott, "[o]ver a ten-month period (January 1996 to October 1996), Marriott, through its zoning counsel, Joseph Damico, Jr. ('Damico'), attempted to win support from the Commissioners to permit the use of a senior assisted-living home at the proposed site." Pls.' Mem. for Summ.J. at 30; Damico Aff. ¶¶ 11–37.[10] First, on January 2, 1996, Damico had a telephone conversation with Anthony Grosso ("Grosso"), the Springfield Township Commissioner for the Ward in which Brighton Gardens would be located, to determine Grosso's initial reaction to the project. After Damico described in general what Marriott intended to do with the property, Grosso apparently was very negative about the project. Damico Aff. ¶¶ 11–12.[11] Instead of abandoning the

---

9. The designated purpose of the "A" Residence District is set forth in the Zoning Ordinance as follows:

 The A Residence District is designed primarily to provide opportunities for low-to-medium density residential development to complement existing residences and neighborhoods. The A Residence District is also designed to permit various uses related to residential developments; to establish regulations to maintain and/or improve the character of the district; and to create opportunities to conserve environmentally sensitive land through an open space option for residential development.

 *See* Springfield Township Code § 143–13 (July 25, 1994). The only permitted principal uses for structures within this type of District are for single-family detached dwellings, municipal buildings and/or uses, railway passenger stations, or open space. *Id.* § 143–14(A). In addition, the Code provides for the following two uses by special exception: educational use which is not for profit and when licensed by the Commonwealth (specifically excluding a hospital, sanitarium, rest home, convalescent home … or any … use akin thereto which is not compatible with nor serves the immediate community); and family day-care home use. *Id.* § 143–14(C)(1–2).

10. Damico described the following four different options which he believed were available to Marriott in order to proceed with the project:

 a) Apply to the Township Commissioners to create a new zoning district in which assisted living/personal care facilities would be permitted and have the property re-zoned to that use;
 b) Apply to the Zoning Hearing Board for a use variance to permit Marriott's intended use on the property;
 c) Attack the validity of the Zoning Code on the basis that it was exclusionary and unconstitutional, in that assisted living/personal care facilities were not an enumerated permitted use anywhere in Springfield Township; or
 d) Present an Application to the Board of Commissioners for an amendment to the Zoning Code to permit a assisted living/personal care facility as a conditional use in an "A" residential zone.

 Damico Aff. ¶ 16.

11. It is interesting to note that Damico stated that "normally" a negative reaction like this would have been sufficient for him to advise the developer to abandon the project. Damico Aff. ¶ 13. Thus, it is unclear whether, in

project as he would "normally" do, Damico recounted that he held meetings with most of the neighbors in the immediate area of the property to assess their opinions of the project. Additionally, in April of 1996, he met with the Springfield Township Solicitor, James J. Byrne, Jr. ("Byrne"), to review the various types of zoning relief available to Marriott. Damico Aff. ¶¶ 15–16.

Further, despite what he claims was the initial negative reaction the project received, Damico chose to proceed with an application for an amendment to the Zoning Code.[12] To effectuate this course of action, on May 2, 1996, Damico delivered to Grosso, an informal Sketch Plan, drafted by Brandywine Valley Engineers, which showed the specific location of the three-story Brighton Gardens building. A few days later, on May 20, 1996, Damico delivered to Byrne a copy of the proposed zoning amendment that Damico had drafted. Damico Aff. ¶¶ 21–24. Finally, on May 23, 1996, a revised Sketch Plan submission, consisting of the application fees and eleven copies of the Sketch Plan, the application form and the proposed zoning amendment, was delivered to the Springfield Township Engineer, David Redash ("Redash"). See Def.'s Ex. G.

During the next few weeks, Damico had numerous telephone conferences with Byrne and Grosso, during which each suggested to Damico than the proposed three-story building should be reduced to two stories. Based on the suggestion, Damico

advised Marriott to have its architect reconfigure the proposed building, which Marriott did.[13]

On September 16, 1996, a revised Sketch Plan was filed with the Township, together with a Revised Amendment to the Zoning Ordinance to reflect the different bulk and area requirements necessitated by a two-story building. Damico Aff. ¶ 28; see also Def.'s Ex. I. On October 1, 1996, Redash issued a report to the President of the Planning Commission, recommending that "the Planning Commission express to the applicant that the project would receive a favorable recommendation if the items mentioned in this memorandum are satisfactorily addressed." See Def.'s Ex. J at 4. For example, Redash recommended some revisions to the proposed zoning amendment; requested more information concerning numerous items, including parking requirements, traffic signal modifications and the inclusion of a perimeter emergency/maintenance road; and suggested that a written statement be provided from the Hancock United Methodist Church regarding present congregation size and anticipated future growth. Id. at 2–3.

On October 3, 1996, Damico, on Marriott's behalf, made a presentation of the informal Sketch Plan to the Springfield Township Planning Commission. See Def.'s Ex. K (Oct. 3, 1996 meeting minutes). The Planning Commission reviewed the presentation, as well as Redash's report, and expressed its concern with the

Damico's opinion, *any* steps beyond this telephone call would be futile given the initial negative reaction.

**12.** Damico offered the following analysis for not choosing any of the other options: 1) the creation of a new zoning district would be subject to attack on the basis that it would constitute "spot zoning;" 2) he did not believe that Marriott could meet the burden of proof requirements for a use variance because the property was not subject to a unique hardship and even if it could demonstrate the existence of a hardship, it would be considered self-inflicted; and 3) attacking the validity of the Zoning Code on the basis that it was exclusionary and unconstitutional would entail

lengthy hearings and would be extremely confrontational with the Township. Damico Aff. ¶ 18.

**13.** The court notes that while Damico never received any comments regarding the initial Sketch Plan from the Delaware County Planning Department, the Department had in fact received Marriott's initial Sketch Plan submission from Redash, and on June 18, 1996, the Department wrote Redash a letter which contained a recommendation to "[proceed to the preparation of preliminary plans [after]] incorporating ... [several] remarks." See Def.'s Ex. H.

"grandness" of the zoning changes as they could impact other open space within the Township zoned "A" Residence. *Id.* at 2. As recorded in the minutes, the Commission further stated that "this was a good project, Marriott was a reputable company and the assisted living quarters were needed within the Township. If the zoning could be done without impacting other Township areas, the plan would be acceptable." *Id.*

Following what Damico described as the "generally positive comments on Marriott's proposal," he received a call on October 9, 1996 from the President of the Board of Commissioners, Thomas Mahoney ("Mahoney"), who informally advised Damico "that there was not any support by the Commissioners for the project." Damico Aff. ¶ 36. Damico received similar comments about the lack of support in subsequent conversations with Grosso and Byrne. In fact, Grosso called Damico on October 15, 1996 and informally advised him that the Commissioners had determined at their October 8, 1996 meeting, that there was no support for Marriott's proposal. According to Damico, the "fact that the Commissioners determined on October 8, 1996 that there was no support for Marriott's proposal clearly indicated that it would be futile to pursue the matter." Damico Aff. ¶ 38. Thus, Marriott never submitted a formal Preliminary or Final Plan pursuant to the S & L Ordinance.

Rather, on March 11, 1997, Marriott, through its current lawyer, Beth Pepper, Esq., demanded in a seven-page letter addressed to the Commissioners that the Township "make a reasonable accommodation under the Fair Housing Act and permit this specific [project] to be built ..." and that the Township respond within fourteen (14) days. Def.'s Ex. M at 1, 6–7. Byrne, on behalf of the Township Commissioners, rejected Marriott's demand that it give Marriot a reasonable accommodation. Def.'s Ex. N at 2. Byrne counseled Marriott that based upon the record Marriott presented in its letter and the fourteen day response period, the Township did not have sufficient information or time to provide a final or definitive response. *Id.* at 1.[14] Byrne also informed Marriott that it still had the right to seek relief from the zoning ordinance since such relief had not yet been sought. *Id.* at 3. On the basis of the solicitor's letter, Marriott now claims that the Township has rendered a final decision. Thus, Marriott filed the instant lawsuit in federal court.

## III. DISCUSSION

### A. *Plaintiffs' Reasonable Accommodation Claims.*

The doctrine of ripeness is a principle of federalism based upon the "case or controversy" requirement of Article III of the United States Constitution, as well as upon policy considerations. *See* 13A Charles A. Wright, Arthur R. Miller and Edward H. Cooper, *Federal Practice and Procedure, Jurisdiction,* 2d § 3532.1 at 115 (1994). Although the Third Circuit has recognized " '[t]here is some disagreement among courts and commentators as to whether the ripeness doctrine is grounded in the case or controversy requirement or is better characterized as a prudential limitation on federal jurisdiction,' " *Taylor Investment, Ltd. v. Upper Darby Township,* 983 F.2d 1285, 1289 (3d Cir.1993) (quoting *Armstrong World Indus. v. Adams,* 961 F.2d 405, 411 n. 12 (3d Cir.1992)), this Circuit has concluded that ripeness is " 'peculiarly a question of timing.' " *Taylor,* 983 F.2d at 1290 (quoting *Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 580, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985)). "[I]ts basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling

---

**14.** Additionally, the Byrne letter stated that the Township would deny the request based upon this limited review, because under this set of limited facts, the project "undermine[d] the Springfield Township zoning scheme and impose[d] undue hardship upon the Township and the neighbors of the proposed site." Def.'s Ex. N at 2.

themselves in abstract disagreements." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

■ In determining whether there is a ripe controversy, courts must consider two factors: 1) the "fitness of issues for judicial decision" and 2) the "hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. 1507.[15]

■ In considering the fitness prong of the ripeness inquiry, courts often examine the following factors: the finality of the agency decision; the futility of further proceedings; and the type of harm alleged. *See Assisted Living Associates of Moorestown, L.L.C. v. Moorestown Township*, 996 F.Supp. 409, 426–28 (D.N.J.1998). In addition, the fitness prong of the ripeness inquiry may involve examining the development of the factual record necessary for decision. *See* 15 James Wm. Moore & Martin H. Redish, *Moore's Federal Practice* § 101.76 (3d ed.1997) (noting that fitness prong of ripeness inquiry involves finality of agency action, certainty of events, or development of factual record necessary for decision). The court will consider these factors in turn.

Courts require finality in zoning decisions because " 'land-use regulation generally affects a broad spectrum of persons and social interests, and ... local political bodies are better able than federal courts to assess the benefits and burdens of such legislation.' " *Acierno v. Mitchell*, 6 F.3d 970, 975 (3d Cir.1993) (*quoting Taylor*, 983 F.2d at 1291). In addition, " '[t]he property owner ... has a high burden of proving that a final decision has been reached by the agency before it may seek compensatory or injunctive relief in federal court on federal constitutional grounds.' " *Id.* (*quoting Hoehne v. County of San Benito*, 870 F.2d 529, 533 (9th Cir.1989)).

Here, Marriott sued the Township under both the FHA and ADA. As the basis of these claims, Marriott alleges that the Township's failure to grant a reasonable accommodation and waive its zoning laws to permit Marriott to build its project violated federal law. However, it is undisputed that Marriott never submitted a Preliminary Plan and Final Plan pursuant to the Township's S & L Ordinance. *See Williamson*, 473 U.S. at 190, 105 S.Ct. 3108 (noting that controversy not ripe when applicant never formally attempted to resolve its zoning problem).[16] To the contrary, Marriott clearly did not progress beyond preliminary discussions with Township officials and submission of the Sketch Plan under the Township's informal procedure.[17]

■ While strict compliance with every local ordinance or regulation is not required, before the denial of a reasonable accommodation claim may be deemed final, the applicant must show that under the circumstances it has afforded the appropri-

---

**15.** It is clear that Marriott can satisfy the second prong as Marriott will suffer some economic hardship due to the delay in building its project if the case is not heard immediately. However, if Marriott submits a formal Preliminary and Final Plan, local law adequately limits the time which a Township has to respond to these properly filed submissions. In addition, it appears that much of the documentation submitted to this court could be utilized in connection with any formal plan Marriott may submit.

**16.** Pursuant to the 12(b)(1) standard, the court is free to make factual findings and hold hearings. The Township contested some of the factual assertions advanced by Marriott and the court held a hearing to consider the ripeness issue. In any event, however, the operative facts concerning ripeness are not seriously in dispute. While informal discussions were held and Marriott did submit a Sketch Plan, Marriott acknowledges that it never submitted a formal Preliminary and Final Plan or sought relief from the Township's zoning scheme with the appropriate local authority.

**17.** While no public hearings were held, it appears that the public was in attendance at the October 3, 1996 Planning Commission's meeting.

ate local authority a reasonable opportunity to consider the project in some final form, to seek the input of the public and of other affected persons, and to state the reasons for its decision. *See Oxford House–C v. City of St. Louis,* 77 F.3d 249, 253 (8th Cir.1996) ("Congress did not intend for the [Fair Housing] Act to remove handicapped people from the 'normal and usual incidents of citizenship, such as participation in the public components of zoning decisions, to the extent that participation is required of all citizens whether or not they are handicapped.'") (*quoting Oxford House, Inc. v. City of Virginia Beach,* 825 F.Supp. 1251, 1262 (E.D.Va. 1993)); *see also Hovsons, Inc. v. Township of Brick,* 89 F.3d 1096, 1106 n. 5 (3d Cir. 1996) (noting that "decision is not to be interpreted as invalidating" local zoning scheme and plaintiff must still adhere to other zoning ordinances and regulations).

■ In this case, because it never submitted a Preliminary Plan Marriott did not afford the Township the opportunity to review a formal proposal. In the absence of a Preliminary Plan, the Township could not solicit comments from the public and other appropriate parties and issue a written decision. Under these circumstances, the court concludes that "sounding off" local Township officials through initial discussions and submitting a Sketch Plan under the Township's ordinances providing for informal procedures were insufficient.

■ Furthermore, Marriott's reliance on the Byrne letter is misplaced. It is plain from the text that Byrne's letter to Marriott rejecting its demand was limited in scope, based on an incomplete record and was prepared with the limited response time of fourteen days. Thus, the letter does not constitute the Township's final decision.

■ Nor was any further action by Marriott bound to be futile. "The proposition that 'litigants are not required to make futile gestures to establish ripeness,' *Sammon v. New Jersey Bd. of Med. Examiners,* 66 F.3d 639 (3d Cir.1995), has been applied in numerous zoning and non-zoning cases to establish the necessary certainty and finality that the 'fitness' prong of the *Abbott* test requires." *Assisted Living Associates,* 996 F.Supp. at 426 (citations omitted). Although Marriott asserts that any further action would be futile, this conclusion is not borne out by the facts. The evidence in this case does not show that the Township attempted to undermine the approval process or refused to consider Marriott's proposal or that in the past the Township had dismissed similar types of proposed developments. To the contrary, Marriott's own proofs point to telephone calls, meetings and conversations between Marriott and Township officials during which the parties explored alternatives to Marriott's proposal, which if carried out, would make approval of the project easier to obtain. That the Township's officials had not agreed to the project initially but were willing to listen to modifications does not prove that the project was doomed *ab initio.*[18]

■ Because Marriott has not shown that the Township has issued a final decision on Marriott's reasonable accommodation claims or that participating in further proceedings would be futile, the court concludes these claims are not ripe for judicial consideration.

Marriott relies upon *Bryant Woods Inn, Inc. v. Howard County,* 124 F.3d 597 (4th Cir.1997), and *Assisted Living Associates of Moorestown, L.L.C. v. Moorestown*

---

18. As to the third prong, the type of harm alleged, it is undisputed that many courts have concluded that because housing discrimination cases, which include a refusal to make a reasonable accommodation under the FHA, create a "uniquely immediate injury," these cases are ripe controversies as soon as an adverse decision is made. *See Assisted Living Associates,* 996 F.Supp. at 427. In this case, however, the Township never made a final adverse decision as Marriott neither filed a formal plan nor sought relief from the zoning code. Additionally, Marriott has not shown it would be futile to do so.

*Township,* 996 F.Supp. 409 (D.N.J.1998), in support of its position. In *Bryant Woods Inn,* the local authorities asserted that both claims under the FHA, the intentional discrimination and the reasonable accommodation claims, were not ripe for disposition because the local authorities had not been given the opportunity to issue a final decision. *Bryant Woods Inn,* 124 F.3d at 601–02. In that case, the applicants had submitted a formal application, hearings had been held at which the public had an opportunity to comment, and the local authorities had issued a written decision. *Id.* at 599–601. Rather than seeking reconsideration of the decision by the local authorities, the applicants filed an action in federal court. *Id.* at 601. Thus, the issue in *Bryant Woods Inn* was whether the applicants were obligated to move for reconsideration before they could show that the decision was final. *Id.* The Fourth Circuit Court of Appeals rejected the claim that the issue was not ripe, finding that "[w]hile the [local authorities] must be afforded an opportunity to make a final decision, this issue is sufficiently concrete for judicial resolution once the accommodation is denied." *Id.* at 602.

In *Assisted Living Associates,* the applicants had filed two formal applications with the local planning board, as well as instituting a state court action seeking review of the initial rejection of the application by the local authority. *Assisted Living Associates,* 996 F.Supp. at 415–18. In that case, the applicants could also point to conduct by the local authorities, who amended the local ordinance to effectively "spot-zone" the proposed use out of the

desired area and imposed other burdensome regulations specifically directed toward the applicants. *Id.* at 419–21. On those facts, the court found that "there is no question as to what the result of an application for a variance [needed for the project to be built] would be" and that "there is 'no question about how the regulations at issue [would apply] to the particular land in question.'" *Id.* at 426 (*quoting Suitum v. Tahoe Regional Planning Agency,* 520 U.S. 725, 117 S.Ct. 1659, 1667, 137 L.Ed.2d 980 (1997) (*citing Williamson,* 473 U.S. at 186, 105 S.Ct. 3108)).[19]

*Bryant Woods Inn* and *Assisted Living Associates* are inapposite. In the instant case, unlike *Bryant Woods Inn* and *Assisted Living Associates,* the evidence shows that: 1) the Township has not attempted to subvert the process of approval, and it has not failed to meet and discuss the project with Marriott and suggest changes where appropriate; 2) no final application has been submitted for land-use approval, amendment to the zoning code, or other relief from the zoning requirements; 3) no hearings have been held at which the public and others affected by the project have been afforded the opportunity to comment; and 4) the public body charged under state law and local regulations with making the decision has not stated its reasons in writing for any decision after a full and meaningful discussion of the issues.

In other words, the posture of this case is such that, unlike *Bryant Woods Inn* and *Assisted Living Associates,* the "issue is [not] sufficiently concrete for judicial resolution", *Bryant Woods Inn,* 124 F.3d at

---

**19.** Although Marriott does not cite the Third Circuit Court of Appeal's decision in *Hovsons, Inc. v. Township of Brick,* 89 F.3d 1096 (3d Cir.1996), as support for its contention that its reasonable accommodation claim is ripe, it does rely heavily on *Hovsons* throughout its brief. An analysis of the facts and procedural history of *Hovsons* shows that the reasonable accommodation claim in that case was ripe because the Township issued a final decision after numerous hearings and consideration of plaintiffs' formal applications. In *Hovsons,* the plaintiffs applied for a variance and this

application was debated extensively during a total of seventeen public hearings over a two-year period. *Id.* at 1099–1100. After the application was denied, the plaintiffs filed a lawsuit against the zoning board in state court. *Id.* at 1100. The state court reversed the denial and remanded the matter to the zoning board, which subsequently denied the application again. After several more rounds of appeals, which ultimately ended with a denial for certification by the New Jersey Supreme Court, the plaintiffs filed suit in federal court. *Id.*

602, and "there is [a] question about how the regulations at issue [would apply] to the particular land in question." *Assisted Living Associates,* 996 F.Supp. at 426 (internal citations omitted). Accordingly, plaintiffs' reasonable accommodation claim will be dismissed as unripe.

### B. *Plaintiffs' Facial Claim Under the FHA.*

▆▆ Although Marriott's reasonable accommodation claim under the FHA is not ripe for judicial review because the Township has not rendered a final decision on Marriott's request, Marriott contends that its claim that the Township's zoning code is facially discriminatory under the FHA is ripe because facial challenges, by definition, present concrete and mature legal controversies that do not require prior administrative action or decision. *See Suitum v. Tahoe Regional Planning Agency,* 520 U.S. 725, 117 S.Ct. 1659, 1667 n. 10, 137 L.Ed.2d 980 (1997) (noting that facial challenges to regulations are generally ripe the moment the challenged regulation or ordinance is passed in "takings" cases).

It is unlawful under the FHA to discriminate against a person based on handicap with respect to housing. *See* 42 U.S.C. § 3604(f)(2). "An ordinance that uses a discriminatory classifications [sic] is unlawful in all but rare circumstances. A violation of the FHA[ ] can be established by demonstrating that the challenged statute ... discriminates against the handicap on its face and serves no legitimate government interest." *Horizon House Developmental Services, Inc. v. Township of Upper Southampton,* 804 F.Supp. 683, 693 (E.D.Pa.1992), *aff'd,* 995 F.2d 217 (3d Cir. 1993).

▆▆ In determining whether an ordinance is invalid on its face, the motive of the drafters of the ordinance is irrelevant. Rather, the "court must focus on the explicit terms of the ordinance." *Id.* at 694

*(citing International Union, United Auto., etc. v. Johnson Controls, Inc.,* 499 U.S. 187, 111 S.Ct. 1196, 1204, 113 L.Ed.2d 158 (1991)). Thus, to establish that an ordinance is facially invalid, a plaintiff must show that the accused ordinance treats someone protected by the FHA in a different manner than others are treated. *See Bangerter v. Orem City Corp.,* 46 F.3d 1491, 1501 (10th Cir.1995). Marriot has failed to make such a showing.

The cases cited by Marriott support this conclusion. In all of Marriot's cases, each challenged ordinance specifically addressed the treatment of handicapped or disabled persons. For example, in *Bangerter v. Orem City Corp.,* the statute expressly outlined special conditions that localities could impose on the granting of zoning permits for group homes for the handicapped. *Bangerter,* 46 F.3d at 1494. Likewise, in *Horizon House,* the language of the offending ordinance clearly referred to people with handicaps. *Horizon House,* 804 F.Supp. at 694 (concluded that use of the words "permanent care" or "professional supervision" in an ordinance expressly singled out for different treatment those who were unable to live on their own, or who in the terms of the FHA, were handicapped). In addition, in *Larkin v. State of Michigan Dept. of Social Serv.,* 89 F.3d 285 (6th Cir.1996), the Sixth Circuit Court of Appeals concluded that portions of a state licensing act which specifically singled out for regulation group homes for the handicapped were facially discriminatory. *Larkin,* 89 F.3d at 289.

In contrast, in this case, Marriott has not identified any specific provision of the zoning code or land use ordinance it challenges whereby elderly persons with disabilities are expressly treated differently than others.[20] Because Marriott has failed to satisfy the essential element of the claim, the entry of summary judgment is

---

**20.** In fact, Marriott candidly acknowledges that the terms "personal care homes" and "senior assisted living homes" are not specifi-

cally mentioned anywhere in the Township's zoning code. *See* Pls.' Mem. in Supp. of Mot. for Summ.J. at 24, 84.

appropriate in favor of the Township on the claim that the Township's zoning code facially discriminates against elderly people with disabilities.[21]

### C. Plaintiffs' Disparate Impact Claims Under the FHA and ADA.

 A violation of the FHA and ADA may also be established by demonstrating a "disparate impact" which requires the plaintiff to prove absent a discriminatory intent on the part of the defendant, the effects of defendant's action were nonetheless discriminatory. *See Horizon House*, 804 F.Supp. at 693(FHA); *see also Horth v. General Dynamics Land Sys., Inc.*, 960 F.Supp. 873, 882 n. 10 (M.D.Pa.1997) (ADA). Under the disparate impact theory, the court's analysis in both FHA and ADA cases is similar to that performed in a Title VII case. *Oxford House, Inc. v. Township of Cherry Hill*, 799 F.Supp. 450, 461 (D.N.J.1992) (*citing Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 934 (2d Cir.), *aff'd*, 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988)); *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 148 (3d Cir.1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978). "Thus, plaintiffs can establish a prima facie case by showing that the Township's action had a greater adverse impact on a protected group than on others, regardless of intent." *Township of Cherry Hill*, 799 F.Supp. at 461 (*citing Huntington*, 844 F.2d at 935).

Summary judgment is inappropriate at this time with regard to plaintiffs' disparate impact claims as there remain numerous issues of material fact as to how the Township's zoning scheme, in fact, impacts disabled or elderly persons. *See* Fed. R.Civ.P. 56(c). More importantly, many of these disputed issues may be resolved, dissipate, or reappear in sharp relief once Marriott submits a formal application to the Township and the Township is given the opportunity to apply its zoning code and issue a final decision.[22]

### IV. CONCLUSION

Marriott has not afforded the Township the opportunity to meaningfully review a formal proposal, to solicit comments from the public and others, or to issue a written decision. For these reasons, the Township had not issued a final decision on Marriott's reasonable accommodation claim. Nor has Marriott shown that pursuing such a decision would be futile. As a result, the court concludes that Marriott's reasonable accommodation claim is not ripe for judicial consideration and will therefore dismiss that claim. In addition, the court will grant the Township's motion for summary judgment on Marriott's facial discrimination claim under the FHA as Marriott has failed to show that the Township's zoning scheme expressly singles out elderly or disabled individuals for different

---

21. Instead, Marriott contends that the absence of language permitting "assisted living homes" in areas zoned residential, combined with the Township's interpretation of its current regulations, is sufficient to show that the zoning code is discriminatory on its face. Contrary to Marriott's contention, the language of the Township's zoning code does not compel the conclusion that the zoning scheme is facially discriminatory. Rather, this argument seems relevant, if at all, to Marriott's claim that the zoning ordinance, as applied by the Township, discriminates against the elderly and disabled.

22. The Township has represented that it would take approximately ninety (90) days to consider and issue a final decision in this case once Marriott submitted a Preliminary Plan. *See also* 53 Pa. Cons.Stat.Ann. § 10508 (requiring local authorities to render a final decision on all formal applications in no later than 90 days). Provided that a formal Preliminary Plan is submitted (as well as the necessary zoning relief sought) and that Marriott is diligent and cooperative within this process, the court will consider failure by the Township to render a final decision within 90 days of submission of the Preliminary Plan and supporting documentation as prima facie evidence that the case is now ripe for judicial review.

treatment. Lastly, because genuine issues of material fact remain as to Marriott's disparate impact claims under the FHA and ADA, the court will deny both Marriott's and the Township's motions for summary judgment on these claims.

An appropriate order follows.

### ORDER

**AND NOW,** this **7th** day of **December, 1999,** upon consideration of plaintiffs' motion for partial summary judgment (doc. no. 51), defendant's response thereto (doc. no. 59), defendant's motion for summary judgment (doc. no. 52) and plaintiffs' response thereto (doc. no. 57), it is hereby **ORDERED** that the motions are **GRANTED IN PART** and **DENIED IN PART** as follows:

1. Plaintiffs' reasonable accommodation claim is **DISMISSED** as not ripe for judicial review;

2. Summary judgment is **GRANTED** in favor of defendant on plaintiffs' facial discrimination claim;

3. Summary judgment is **DENIED** on plaintiffs' disparate impact claims; and

4. Plaintiffs' disparate impact claims under the FHA and ADA, as well as the claims under § 504 of the Rehabilitation Act (Count 2) and the Equal Protection claim (Count 4) are placed in **SUSPENSE** for ninety (90) days.

**AND IT IS SO ORDERED.**