**PATHWAYS PSYCHOSOCIAL, et al.**

v.

**TOWN OF LEONARDTOWN, MD, et al.**

### No. CIV.A. DKC 99–1362.

United States District Court, D. Maryland.

March 29, 2001.

Beth Pepper, Stein & Schonfeld, Victoria M. Shearer, Allen, Johnson, Alexander & Karp, Baltimore, MD, Robert L. Schonfeld, Law Office, Garden City, NY, for Plaintiffs.

Daniel Karp, Law Office, Baltimore, MD, for Defendants.

Tawana E. Davis, U.S. Attorney's Office, Baltimore, MD, for Amicus.

## MEMORANDUM OPINION

CHASANOW, District Judge.

Pathways Psychosocial Support Center ("Pathways"), Clarissa Ann Edwards, and Walter Cotter, ("Plaintiffs") have brought suit against Defendants [1] alleging that they refused to allow Pathways to relocate its psychiatric rehabilitation facility to downtown Leonardtown, Maryland, because their clientele is mentally disabled. Plaintiffs allege that Defendants violated their rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, *et*

seq., the Rehabilitation Act [2], and the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution. Presently pending before this court is Defendants' motion for summary judgment. The issues have been fully briefed, and no hearing is deemed necessary. Local Rule 105.6. For the following reasons, the court shall GRANT Defendants' motion for summary judgment in part and DENY it in part.

## I. *Background*

Pathways is a non-profit agency licensed by the Maryland Department of Health and Mental Hygiene to provide a type of mental health service called "psychiatric rehabilitation" for individuals with serious mental illness. In the spring of 1997, Gerald McGloin, executive director of Pathways, contacted Robert Guyther, the Town Administrator, to find a downtown location for the program. Def. Ex. 1, McGloin Dep., 50; Ex. 2, Guyther Dep., 38–39.

Mr. Guyther suggested several locations, and in a conversation a few days later, Mr. McGloin expressed interest in one particular building that had been suggested, the Court Square Building. Guyther Dep., 38–39. Mr. McGloin informed Guyther that Pathways would be counseling mentally disabled patients and that the space would be used for administrative offices and counselors. Guyther Dep., 47–48. The Leonardtown Town Council ("the Council") declared its downtown a "designated neighborhood" so that low-interest state loans could be made available to businesses willing to participate in revitalization efforts. Because the Court Square Building was located within the "designated neighborhood", businesses within this building would be eligible to apply for low

1. Defendants are the Town of Leonardtown as a municipal corporation, the Mayor of Leonardtown, various members of the Leonardtown Planning and Zoning Commission, the town commissioners, and the town administrator.

2. Plaintiffs stated, in a status report to chambers, that the Rehabilitation Act claim would be withdrawn, but a dismissal has not been filed. Defendants assert in their motion that the claim has been withdrawn and Plaintiffs do not contend otherwise. Thus, the court will dismiss this claim.

interest state loans provided that they had the Town's endorsement. Mr. Guyther offered to ask the Council for an endorsement on Pathways' behalf.

On May 19, 1997, Mr. Guyther described Pathways' potential move to the Court Square Building as follows:

> We have a resolution before us. I think I should announce for the record that this building under contract of sale belongs to my father, but I'm not getting anything out of it, but anyhow the people that are proposing to buy this is called Pathways, Inc. which is a counseling center and jobs and mental health counseling center ... and that they would like to consolidate all their operations into this building within the designated areas for the loans and grants that the State is to provide.

Guyther Dep., 97–100; Videotape of May meeting. The Council members unanimously approved the resolution and voiced no concerns as to the nature of Pathways' business. Videotape of May meeting.

### A. Rescission of Town Endorsement

At the July 1997 meeting, the Council rescinded its endorsement of Pathways. The Town Council members are Ruth Proffitt, Bernard Delahay, Susan Erichsen, Daniel Muchow, and Walter Wise. Daniel Muchow, a member of the Council who was absent from the May meeting, spearheaded an effort to rescind the endorsement granted to Pathways, prior to the vote.[3] Mr. Muchow called Mr. McGloin and Mayor Norris, to express his disapproval of Pathways' receipt of revitalization funds and move to downtown spe-

cifically because Pathways' clients would "be a public nuisance" and would "urinate in public", "get drunk", "be exhibitionists", and "be violent." Pl.Ex. 1, McGloin Dep., 86–89; Pl.Ex. 5, Norris Dep., 138. Mr. Muchow also conducted a petition drive where he knocked on townspeople's doors and stopped into shops, publicly denouncing Pathways as a vehicle by which mentally disabled people would move downtown and become a public safety risk. Pl. Ex. 14, D'Espito Aff. at ¶ 4. Katherine D'Espito, a resident of Leonardtown, recalled that Mr. Muchow knocked on her door and related that an organization called Pathways wanted to move downtown and that the people in the program, with all their problems would be "wandering around the town unsupervised .... that these people had mental problems and some had scrapes with the law." Id. Ms. Garner, a local shopkeeper, recounted that Mr. Muchow stated that his objective was to convince the business and community people in town to join together to oppose the move by Pathways and then he asked her to place a petition in her store. Pl.Ex. 15, Garner Dep., 14–22.

Mr. Muchow presented these petitions containing at least 120 signatures at the July 14 Council Meeting.[4] Mayor Norris asked Mr. McGloin to attend the meeting to answer questions but Mr. McGloin declined, stating that he could not make the meeting on such short notice. Def. Ex. 9, Town Council Minutes July 14, 1997, 000133.[5]

At the meeting, various council members expressed concerns about Pathways being a residential facility and that this would

---

**3.** Defendants contend that Mr. Muchow did not ultimately affect the opinions held by the rest of the Council members because he was known to dislike Mr. Guyther and entertained "conspiracy theories". Paper No. 29, 5. However, it is undisputed that Mr. Muchow raised awareness among townspeople by personally circulating a petition.

**4.** Defendants assert that the petitions were not officially accepted by the Council and thus, do not serve as evidence that the Coun-

cil vote was influenced by discriminatory animus. However, Defendants do not dispute that the petitions were introduced by Mr. Muchow at the meeting and that they generated discussion among the Council members.

**5.** Mr. Muchow submitted a revision to the minutes in which he claims to have asked Mr. McGloin to attend the meeting only to have him refuse because he "found public meetings to be counter-productive." Id. at 000139.

lead to Pathways' clientele walking around downtown without supervision. *Id.* at 000134. Ms. Erichsen described the atmosphere of the meeting with these words:

> [T]hese people had been talked to in a manner that would create fear in them, and that there was a genuine fear that something could happen, that you know, I didn't agree with. But there was a real-it was a lot of elderly women and they weren't rational. Can I say that? That was the air, that you were dealing with people who weren't rational.
>
> Q: And what was the fear that you believe was expressed or what did you understand?
>
> A: I think they thought that it was fear for their physical safety, these older women ... I couldn't figure out why they would be so up in arms.

Pl.Ex. 12, Erichsen Dep., 69. Mayor Norris stated that the members of the community expressed fear about safety, lack of supervision, and declining property values. Pl.Ex. 5, Norris Dep., 177. The Council then voted to rescind its endorsement of Pathways. On July 21, 1997, the Town's attorney, Karen Abrams, sent a letter to Mr. McGloin indicating that the Town retracted its endorsement of Pathways to apply for a revitalization loan. Def. Ex. 14, Let. Of July 21, 1997. However, Ms. Abrams' letter also invited Mr. McGloin to reapply for the Town's endorsement and schedule a time when he could be present to answer questions and explain Pathways' plans. *Id.*

Plaintiffs assert that without the Council's endorsement Pathways could not acquire a loan from the State, and without the loan, it could not purchase the Court Square Building. Additionally, on July 28, 1997, Mayor Norris, Ms. Proffitt, and Mr. Muchow visited Pathways' offices. These officials told Mr. McGloin about the fears many senior citizens had about being assaulted by Pathways' clients, and the desire to have other types of businesses move into the town. Pl.Ex. 1, McGloin Dep. pp. 154–157.

### B. Denial of the Occupancy Permit

At this point, Pathways decided to pursue an alternative downtown location, the McCrone Building. On August 22, 1997, Pathways signed a contract to purchase the McCrone Building from a bank which would also provide the financing. Def. Ex. 16, Contract of Sale. Thus, no public financing would be required. On September 2, Mr. Guyther called Mr. McGloin stating that the Mayor had heard Pathways wanted to purchase the McCrone Building, but that Pathways required an "occupancy permit" and that the permit would be denied due to "insufficient parking." Pl.Ex. 1, McGloin Dep., 151. Mr. McGloin filed an occupancy permit application on September 5 stating Pathways' anticipated use as: "Offices, psycho-social day program." Def. Ex. 21, Permit App. Mr. Guyther denied the occupancy permit request claiming that the Mayor had instructed him to refuse because certain parking requirements were not met. Pl. Ex. 1, McGloin Dep., 151, 170–173; Pl.Ex. 7, Guyther Dep., 178–179, 190–192. Mayor Norris informed Mr. McGloin that he would have to take his proposal to the Planning and Zoning Commission ("the Commission") where the public's interests could be represented in an open forum. *Id.*

Plaintiffs assert that this denial of their occupancy permit application was a radical departure to the policy and practice of Leonardtown. Ms. Bonel, the Town Planner, who had primary responsibility for administering, interpreting, and issuing permits had regularly issued dozens of occupancy permits for all types of professional, medical, and health-related services; had never conferred with the Mayor on any of them; never denied a permit application; and, never sent any to the Planning Commission for a fact-finding proceeding.[6] Pl.Ex. 17, Bonel Dep., 49,

---

6. She was on maternity leave when Pathways

submitted its occupancy permit application.

92–93. Moreover, Ms. Bonel regularly informed the Planning Commission of the permits she issued, which they ratified and never questioned. Pl.Ex. 17, Bonel Dep., 101. Typically, applicants received their occupancy permit within 24 hours of submitting the application.

### C. Planning Commission Denied Pathways an Occupancy Permit

Defendants contend that this matter was referred to the Planning and Zoning Commission because Pathways' use did not clearly fit the requested zoning district rather than for possible parking requirement violations. Paper No. 29, 14. On October 30, 1997, the Commission met to decide if Pathways' designated use fit within the zoning classification of the Commercial/General ("C–G") district. Members of the Commission at that time were Ned Brinsfield, Charles Faunce, Joan Holmes, Susan Erichsen (also a Councilwoman), and Charles Breck. In preparation for this meeting, Mr. Faunce, Ms. Holmes, and Mr. Breck toured the existing Pathways' facility.

At the October Commission meeting, Pathways asserted that it should be granted the permit because it is an "office" and/or an "office building" and would have been used as a "clinic" or a "medical office building". Compl. ¶ 29. According to Article V, § V–I(C), (D) of the Leonardtown Zoning Ordinance, permitted uses in the C–G zoning district included "offices", "office buildings", "medical office buildings", and "clinics". These categories are not defined within the ordinance. Id. The Commission, however, found that Pathways did not fit within the permitted uses of the C–G zone. Def. Ex. 30, Meeting Transcript, 98–105. According to the Commission members, there was no finding as to which zone Pathways' proposed use actually fits, however there was unanimity that Pathways failed to fit any of the designations of the C–G zone. Id. Nevertheless, Mr. Breck still encouraged Pathways to locate downtown, stating that the Commission would "embrace [Pathways] coming back to us and saying that you wanted to be in the I/O classification, and I don't think there's anybody in the town who knows your business who wouldn't want the business in Leonardtown, and we certainly have these other areas for just that specific use and we have similar things that fit within that [pointing to Marcy House, the hospital, and government center housing the senior day program.]" Def. Ex. 30, Meeting transcript, 103–104.

### D. Letter Requesting Exception to Zoning Policy

Pathways did not seek to have a conditional use added to the ordinance's C–G zone, file an appeal to the Board of Appeals, or request a zoning text amendment. Rather, Mr. McGloin sent letters to Mr. Brinsfield and Mayor Norris requesting "reconsideration" based upon Pathways' need for accommodation under the ADA. By letters dated November 21, 1997, and December 1, 1997, Ms. Abrams denied the request on behalf of the Town Council and Planning and Zoning Commission. Def. Ex. 33.

### E. Relief Requested

Plaintiffs seek declaratory and injunctive relief as well as compensatory and punitive damages. They ask for declaratory relief that a psychiatric rehabilitation center is a permitted use in the Commercial–General District of Leonardtown and injunctive relief prohibiting Defendants from denying Pathways the right to operate a psychiatric rehabilitation center in the Commercial–General District of Leonardtown. Additionally, Plaintiffs request compensatory and punitive damages in the amount of $ 10,000,000 for Pathways and an appropriate award in favor of Clarissa Edwards and Walter Cotter for the loss of their civil rights. Plaintiffs also seek costs and attorney's fees.

## II. *Summary Judgment Standard*

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505; *see also Pulliam Inv. Co. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir.1987); *Morrison v. Nissan Motor Co.,* 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.,* 181 F.2d 390, 394 (4th Cir.1950). The moving party bears the burden of showing that there is no genuine issue of material fact. Fed.R.Civ.P. 56(c); *Pulliam,* 810 F.2d at 1286 (citing *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979)).

When ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of and construe the facts in the light most favorable to the non-moving party. *Tinsley v. First Union Nat'l Bank,* 155 F.3d 435, 437 (4th Cir. 1998). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element ... necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505.

In *Celotex,* the Supreme Court stated:

In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

*Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. However, " 'a mere scintilla of evidence is not enough to create a fact issue.' " *Barwick v. Celotex Corp.,* 736 F.2d 946, 958–59 (4th Cir.1984) (quoting *Seago v. North Carolina Theatres, Inc.,* 42 F.R.D. 627, 632 (E.D.N.C.1966), *aff'd,* 388 F.2d 987 (4th Cir.1967)). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

## III. *Analysis*

Plaintiffs allege that Defendants have violated their rights pursuant to the ADA, and the equal protection and due process clauses of the Fourteenth Amendment to the United States Constitution by 1) the Town Council's rescission of their endorsement of Pathways for a state loan; 2) the September 1997 refusal to issue an occupancy permit; 3) the Planning and Zoning Commission's denial of the occupancy permit; and 4) the December 1997 refusal to make an exception to its zoning policy.

### A. Individual vs. Official Capacity

#### 1. ADA Claims

■ Plaintiffs have sued the natural persons in both their individual and official capacities. As a preliminary matter, De-

fendants assert that Plaintiffs cannot bring suit against them in their individual capacities pursuant to Title II of the ADA. This court agrees. Title II holds in pertinent part:

no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity.

42 U.S.C.A. § 12132. In *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 n. 8 (8th Cir.1999), the court held that government officials could not be sued in their individual capacities directly under the provisions of Title II. The court explained that "Title II provides disabled individuals redress for discrimination by a 'public entity.' *See* 42 U.S.C. § 12132. That term, as it is defined by the statute, does not include individuals. *See* 42 U.S.C. § 12131(1)." *Id.*; *see also Walker v. Snyder*, 213 F.3d 344, 346 (7th Cir.2000)(finding no personal liability under Title II).

Although the Fourth Circuit has not explicitly ruled on this question, in *Baird v. Rose*, 192 F.3d 462, 471 (4th Cir.1999), the court recognized that both parties agreed that Title II of the ADA does not recognize a cause of action for discrimination by private individuals, only public entities. Thus, Plaintiffs' ADA claims against Mr. Guyther, Mayor Norris, Ms. Proffitt, Mr. Delahay, Ms. Erichsen, Mr. Muchow, Mr. Wise, Mr. Brinsfield, Mr. Breck, Ms. Holmes, and Mr. Faunce in their individual capacities shall be dismissed.

### 2. § 1983 Claims

■ Plaintiffs also assert § 1983 claims alleging equal protection and due process violations against the same persons in their individual and official capacities. However, under § 1983, state officials or officers "are not liable in their official capacities because a section 1983 suit against an officer in his official capacity is no different from a suit against the state itself." *Will v. Michigan Dep't. of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Therefore, the civil rights claims as to each person in his or her official capacity shall be dismissed because these claims essentially merge into the claims brought against the municipality. Additionally, "[s]tate officers are subject to § 1983 liability for damages in their personal capacities ... even when the conduct in question relates to their official duties." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 n. 24, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997). Plaintiffs' claims against these defendants in their respective individual capacities shall be addressed later in this opinion.

### B. ADA CLAIMS

■ The purpose of the ADA was to establish "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1). "As a remedial statute, the ADA must be broadly construed to effectuate its purpose." *Civic Ass'n of Deaf of New York City v. Giulani*, 915 F.Supp. 622, 633 (S.D.N.Y. 1996).

■ Defendants deny that the endorsement of the Town Council is a benefit and thus, argue that Plaintiffs' ADA claims based on the endorsement should be denied. However, courts have held that Title II should be interpreted expansively. *See Bay Area Addiction Research and Treatment v. City of Antioch*, 179 F.3d 725, 730–731 (9th Cir.1999) ("Section 12132 [Title II] constitutes a general prohibition against discrimination by public entities."); *Innovative Health Systems, Inc. v. City of White Plains*, 931 F.Supp. 222, 231 (S.D.N.Y.1996), *aff'd*, 117 F.3d 37, 49 (2d Cir.1997) (stating "[t]here is no suggestion in the statute [Title II of the ADA] that zoning or any other type of public action is to be excluded from this broad mandate."). Moreover, this interpretation of Title II is supported by the ADA's legislative history and the Department of Justice regulations. The report of the House Committee on Education and Labor stated:

The Committee has chosen not to list all types of actions that are included within the term "discrimination" as was done in Title I and Title III, because this title essentially simply extends the anti-discrimination prohibition embodied in section 504 to all actions of state and local governments.

H.R.Rep. No. 101–485(II), at 84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 367. Additionally, the preamble to the Department of Justice regulations implementing Title II notes that "title II applies to anything a public entity does." 28 C.F.R. pt. 35, app. A at 438 (1998). The town council's endorsement is a mandatory prerequisite to applying for a low-interest state neighborhood revitalization loan. Moreover, these endorsements are a benefit only the town council, a public entity, can provide. Thus, both the grant and the rescission of the endorsement qualify as acts of a public entity governed by Title II.

In order to establish disability discrimination in violation of the ADA, a plaintiff must prove 1) that he is a qualified individual with a disability; 2) that he is otherwise qualified for the benefit in the question; and 3) that discrimination due to his disability served as a motivating factor in his exclusion from the benefit. *Baird v. Rose*, 192 F.3d at 466.[7] Plaintiffs allege that Defendants violated their rights pursuant to four different theories under the ADA: 1) intentional discrimination; 2) a disparate impact resulting from a facially neutral policy; 3) a failure to provide a reasonable accommodation; and 4) an impermissible segregation of mental health services for people with mental illness.

### 1. Intentional Discrimination

The parties do not dispute that Pathways' clients, as people suffering from mental illness, qualify as being disabled.

Nor is there any argument that Plaintiffs are not otherwise qualified for the benefits. The central question is whether discrimination stemming from Pathways' treatment of the mentally disabled motivated the Town Council's rescission of its endorsement and the repeated denial of an occupancy permit to Pathways.

■ Plaintiffs alleging intentional discrimination shoulder the burden of showing, by either direct or circumstantial evidence, that a decision to deny a "benefit" was motivated by unjustified consideration of the disabled status of individuals who would be affected by the decision. *Bryant Woods Inn, Inc. v. Howard County, Maryland*, 911 F.Supp. 918, 929 (D.Md.1996), *aff'd*, 124 F.3d 597 (4th Cir.1997). Determining whether a discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). The Fourth Circuit has noted that,

> officials acting in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate .... Even individuals acting from invidious motivations realize the unattractiveness of their prejudices when faced with their perpetuation in the public record.

*Smith v. Town of Clarkton*, 682 F.2d 1055, 1064 (4th Cir.1982). Furthermore, "courts have acknowledged that government officials may conceal discriminatory intent by claiming that they relied upon objective, neutral criteria such as parking regulations." *Bryant Woods Inn*, 911 F.Supp. at 928. Proper factors to consider in evaluating a claim of discriminatory decision-mak-

---

**7.** Defendants assert that the causation standard for ADA claims is unsettled in the Fourth Circuit. However, in *Baird,* the Fourth Circuit explicitly addressed this point and explained that a plaintiff proceeding under the ADA need not prove that her disability was the sole factor for the discriminatory action. 192 F.3d at 469. Thus, Plaintiffs must show that impermissible discrimination was a *motivating* but not a *sole* factor in excluding them from receiving the benefits in question.

ing include: (1) the discriminatory impact of the governmental decision; (2) the decision's historical background; (3) the specific sequence of events leading up to the challenged decision; (4) departures from the normal procedural sequences; (5) departures from normal substantive criteria and (6) legislative or administrative history including contemporaneous statements by members of the decision-making body. *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. at 266–268, 97 S.Ct. 555; *Sylvia Dev. Corp. v. Calvert County, Maryland*, 48 F.3d 810, 819 (4th Cir.1995); *Tsombanidis v. City of West Haven, Conn.*, 129 F.Supp.2d 136, 152 (D.Conn. 2001).

### a. Rescission of the Town Council Endorsement

■ The Town Council unanimously endorsed Pathways in their May meeting and then rescinded that endorsement at their July meeting. As evidence that impermissible discrimination underlay this decision, Plaintiffs point to a) the Council member leading the opposition; b) the remarks made by community members; c) the town council's departure from typical endorsement practices; and d) Defendants' reasons for the rescission, which they contend are pretext for discrimination.

The events leading up to the rescission certainly indicate that a discriminatory animus drove the process. The Council only voted to rescind after Mr. Muchow, a Council member, successfully spearheaded an effort to build community opposition to the endorsement. He personally knocked on citizens' doors and went into local shops, asking people to sign petitions requesting the Council rescind its endorsement of Pathways. Moreover, he enlisted local business and community people to lead efforts of their own by giving them petitions. Defendants ask the court to disregard Mr. Muchow's actions as someone who carries little influence among the council members. However, Defendants do not dispute that Mr. Muchow led a campaign in which he solicited community

opposition by spreading stereotypes and fear about Pathways' clientele. Thus, while Mr. Muchow may not have been able to persuade other council members, he clearly influenced community members who in turn had the power to affect the decisions of the remaining council members.

Moreover, the community opposition expressed at the July meeting clearly stemmed from a discriminatory animus. According to Ms. Erichsen, the July Council meeting at which the rescission took place was "heated" composed of "a lot of elderly women" who were "up in arms", "weren't rational", with a "genuine fear that something could happen" to "their physical safety." Ms. Proffitt also expressed that everyone who spoke at the meeting opposed Pathways' move downtown because like her, they believed downtown was not a suitable location for Pathways' clients. Mayor Norris characterized the opposition as raising issues about public safety, supervision, and declining property values.

Defendants admit that Mr. Muchow and Ms. Proffitt demonstrated discriminatory animus but contend that the other three members of the council made the decision by weighing legitimate concerns. However,

[a]lthough the City may consider legitimate safety concerns in its zoning decisions, it may not base its decisions on the perceived harm from such stereotypes and generalized fears. As the district court found, a decision made in the context of strong, discriminatory opposition becomes tainted with discriminatory intent even if the decisionmakers personally have no strong views on the matter.

*Innovative Health Systems*, 117 F.3d 37, 49 (2d Cir.1997); *United States v. Borough of Audubon*, 797 F.Supp. 353, 361 (D.N.J. 1991), *aff'd*, 968 F.2d 14 (3rd Cir.1992)(finding that the discriminatory intent of government officials may be es-

tablished where animus towards a protected group is a significant factor in the community opposition to which the commissioners are responding). From the record, the community opposition in Leonardtown appears to arise directly from fears founded in stereotypes about the mentally disabled.

Plaintiffs also assert that Defendants departed from substantive and procedural norms. Typically, the Council's endorsement was automatic. Pl.Ex. 7, Guyther Dep., 57. The only criterion for the endorsement was that the building be located in the designated revitalization neighborhood. No significance had ever been attached to the nature of the business seeking the endorsement. Pl.Ex. 12, Erichsen Dep., 50. Plaintiffs also contend that Defendants had never previously rescinded a resolution granting an endorsement for a state loan, much less had a second public session to re-open and overturn an endorsement.

Defendants do not deny the truth of this statement, however, they contend that the endorsement process for the State loans only began in 1996. Thus, they argue that the process was too new to have established procedures when the Pathways resolution was passed in May 1997. Additionally, they assert that the three other resolutions previously passed failed to raise controversy and had apparent uses. However, this seems to contradict Mr. Guyther's assertion that the location of the building rather than the nature of the business was the sole criterion used in assessing the endorsement. *See* Pl.Ex. 24, Collection of Numerous Resolutions and Minutes (minutes lack any discussions of the nature of the businesses). Moreover, at the beginning of the July meeting, Mayor Norris emphasized that a business' use is a zoning consideration and not part of

the criteria in deciding on a loan endorsement. Def. Ex. 4, Videotape of July Meeting. Thus, based on past procedure, Plaintiffs assert the nature of Pathways' operations should have been irrelevant for this purpose of obtaining the town's endorsement.

Additionally, Defendants contend that the fact that Mr. Guyther's father owned the Court Square Building and the lack of information about Pathways' operations primarily drove the Council to rescind its endorsement. Plaintiffs, in response, assert the record reflects that Defendants' proffered reasons are complete pretext.

It is undisputed that when Mr. Guyther initially presented the Pathways proposal he disclosed that his father owned the building. Thus, all the Council members with the exception of Mr. Muchow knew this information and still voted to endorse the project. Moreover, a year after the rescission, another business asked the Council for its endorsement to buy the Court Square Building and the resolution passed without opposition. Defendants' assertion that concern over the propriety of Mr. Guyther's father owning the building drove this rescission is amply contradicted by the record.[8]

Defendants also assert that a lack of information about Pathways drove the rescission. However, the public record from the July meeting reflects the Council members agreeing with or responding directly to community opposition based on fears and stereotypes of mentally disabled people. *See Audubon*, 797 F.Supp. at 361 (holding that town cannot defend zealous enforcement of zoning ordinances by arguing that its actions were merely a response to community sentiment when that sentiment was clearly discriminatory). Mr.

---

**8.** Defendants also assert that personal animosity between Mr. Muchow and Mr. Guyther and Mr. Muchow's own interest in this building fueled the rescission. Defendants contradict themselves by arguing Mr. Muchow wielded little influence, and yet, he con-

vinced the other Council members that Mr. Guyther's proposition should fail. Moreover, a year later, a resolution concerning the same Court Square Building passed with no opposition, not even from Mr. Muchow.

Muchow promoted these stereotypes in this exchange with a citizen:

> Mr. Muchow: I asked Mr. McGloin about outside supervision. He said there was none.
>
> Citizen: No supervision.
>
> Mr. Muchow: No outside supervision ... Some people I talked to did have concerns about the safety of these people when they were offsite because they are not supervised.
>
> Citizen: In other words they have the run of the town.
>
> Mr. Muchow: Yes.

Def. Ex. 4, Videotape of July Meeting. Moreover, there is no dispute that both Mr. Muchow and Ms. Proffitt made statements which could be construed as based on stereotypes of the mentally disabled. Plaintiffs have amply demonstrated there is a genuine issue of triable fact as to whether the Council's decision to rescind was in part motivated by a discriminatory animus.

Defendants also argue that even though the Council rescinded the endorsement, the Council members invited Pathways to reapply for the Town's endorsement. Thus, Defendants assert that ,they should not be held liable for the inability of Plaintiffs to purchase the building, because Plaintiffs volitionally abandoned the project. Plaintiffs concede that this argument may be relevant on the measure of damages but assert it is irrelevant as to the issue of liability.

In *Alexander v. Riga*, 208 F.3d 419, 427 (3rd Cir.2000), *cert. denied*, — U.S. —, 121 S.Ct. 757, 148 L.Ed.2d 660 (2001), the Third Circuit found that where prospective tenants were subjected to illegal discrimination in violation of the Fair Housing Act, there was no "legal causation" requirement beyond the showing of illegal discrimination. In that case, defendants argued that the discrimination was the legal cause for the harm, which itself must be proved. *Id.* The Third Circuit disagreed and went on to say "[i]f an individual proves discrimination, he or she need not prove anything else .... the 'harm' is the discrimination." *Id.* Thus, to withstand summary judgment Plaintiffs do not need to establish that the rescission definitively prohibited them from purchasing the building.

### b. Denial of Occupancy Permit On 9/27

■ Plaintiffs further contend that Mr. Guyther's denial of Pathways' occupancy permit was motivated in large part by discriminatory animus. For evidentiary support, Plaintiffs point to the substantial departure from enforcement procedures and substantive criteria, the historical background of the decision, and the shifting rationales given by Defendants as reasons for the refusal.

Before Pathways had even filed an application, Mr. Guyther called Mr. McGloin to inform him that the Mayor had heard he signed a contract of sale for the McGrone Building, that he would need an occupancy permit, and that his occupancy permit application would be denied.[9] Mr. Guyther himself admits that such pro-active enforcement is not the typical procedure that the Town employed to process occupancy permit applications. Mr. Guyther further testified that even though the Leonardtown zoning code requires that a new building owner or tenant obtain an occupancy permit, the Town relied exclusively on individual businesses to come forward to request a permit. Pl.Ex. 7. Guyther Dep., 172–173. Thus, Defendants admit because of this practice there were businesses and operations in the commercial zone that did not have occupancy permits, despite a change in ownership or tenancy. Pl.Ex. 16, Def. Admissions Nos. 6 and 10.

Plaintiffs also contend that the manner in which Pathways' application was han-

---

9. Typically, occupancy permit applications go to the Town Planner, Ms. Bonel. However, she was out on maternity leave so Mr. Guyth- er, the Town Administrator, stepped in to handle Pathways' permit application.

dled differed dramatically from the normal procedure and offers the following examples:

- Pathways is the only business whose application for an occupancy permit had been denied, not only since February 1995 when the task of issuing permits was delegated to the Town Administrator's office, but even as far back as 1985, before this delegation occurred.
- Mayor Norris is not involved in issuing permits, although he was involved in the case of Pathways.
- Pathways is the only business whose permit application has not been approved and issued by the Town Administrator's office within twenty-four hours, an office that has approved dozens of permits every year since 1995.
- Pathways is the only business whose permit application was evaluated according to the Town Administrator's office subjective view of the nature of its business versus deferring to the business' description of itself.
- Pathways is the only business whose permit application was evaluated according to a site visit made by the Town Administrator's office.
- Pathways is the only business that the Town Administrator's office has not classified as either a "professional office" or "medical office"; yet, other businesses providing counseling, therapy, rehabilitation, recovery, health, or other medically-related services have been classified in one or both of these categories.

In answer to these assertions, Defendants contend that the office had a custom of informing potential applicants of possible zoning problems. However, Defendants have offered no evidence reflecting this pro-active enforcement policy or that the Town Planner ever offered unsolicited zoning advice. Moreover, Mr. Guyther claims that the Mayor was involved only because he went to him for advice. How-

ever, this assertion contradicts Mr. Guyther's testimony that the Mayor initially contacted him and instructed him to call Mr. McGloin prior to Pathways' filing an occupancy permit application.

Defendants also contend that the reason that the occupancy permit was not issued is because Mr. Guyther deferred to Pathways' description of itself as a "psychosocial day program." Doubtful that this description fit within the use designations of the C–G zone, Mr. Guyther asserts that he and the Mayor decided that this permit application was not a routine matter and required approval by the Office of Planning and Zoning. Defendants also contend that Pathways' description lent itself to a possible institutional use that differentiated Pathways from other businesses classified as either "offices" or "medical offices". Moreover, they assert that Mr. Guyther's visit to Pathways was done out of an willingness to learn rather than an intent to discriminate. Nevertheless, that does not counter Plaintiffs' assertion that no other business was evaluated on the basis of a site visit.

As further evidence of the discriminatory animus, Plaintiffs point to Mayor Norris' site visit on July 28, 1997, prior to Pathways' filing a permit application, in which he allegedly told Mr. McGloin that his program was not the type of business that would be desirable for the downtown, and that the fears and concerns of the town residents "needed to be represented." Pl.Ex. 1, McGloin Dep., 155–156. Mr. McGloin also testified that the Mayor told him in September that he had instructed Mr. Guyther not to issue the permit because he "had concerns about safety and loitering in the town and ... felt that he needed to represent the concerns of the town residents since they had already made their opposition known, at least those who signed the petition." Pl.Ex. 1, McGloin Dep., 174–176. Mayor Norris himself acknowledged that community sentiment played a role in his actions. Pl.Ex. 5, Norris Dep., 214–215. Defendants do

not dispute that Mayor Norris made these comments.

Plaintiffs also contend that Mr. Guyther and the Mayor offered shifting rationales as to the reasons Pathways' occupancy permit application would be denied. Plaintiffs assert that initially Mr. McGloin was told on the phone that the permit would be denied because of insufficient parking. Later, he received a letter from Mr. Guyther stating that certain inspections had to be done and that Pathways operated an "adult day care facility" which would not be allowed in the C–G zone. However, Plaintiffs point out that the Town dropped its parking argument shortly before the October meeting on the advice of its counsel. Pl.Ex. 18, Letter from Ms. Abrams. Additionally, in its memorandum, the Town does not contend that Pathways is an adult day care facility, but rather that it simply does not know where Pathways fits.

Defendants do not address Mr. Guyther's initial phone call but contend that Mr. Guyther's letter raised the two standard permit issues of parking and inspections. This same letter also stated that Pathways may not fit the C–G zone because the zone does not include "adult day care or an equivalent activity as either a permitted or conditional use." Thus, Defendants claim that they have consistently raised the issue of use the entire time and only dropped the parking issue when it became apparent it was no longer a problem for reasons not previously known. However, Defendants do not explain the discrepancy between claiming that Pathways is classified as an adult day care facility and then asserting that Pathways' use designation has not been defined. Between the departure from procedural and substantive norms, historical background, and shifting rationales, Plaintiffs have raised a genuine issue of triable fact as to whether Mr. Guyther and Mayor Norris' refusal to issue the occupancy permit in September was in part due to discriminatory animus.

### c. Planning and Zoning Commission's Denial of the Occupancy Permit

Plaintiffs contend that the Commission's refusal to grant Pathways an occupancy permit, in part, also results from discriminatory animus. To establish their claim, Plaintiffs assert that the sequence of events leading up to the decision, departures from substantive criteria, and the shifting positions of the Commission demonstrate the impermissible discrimination underlying this action.

Both parties agree that Leonardtown is a small town. Plaintiffs contend that the members of the Commission were either personally involved in the July Council meeting or had personal knowledge of it and of the intense community opposition. Moreover, Ms. Erichsen is a member of both the Council and the Commission. Another Commission member, Joan Holmes, had attended the July meeting and witnessed the community opposition. Mr. Breck had been personally lobbied by Mr. Muchow to vote against Pathways due to the community opposition. Pl.Ex. 28, Breck Dep., 80–84. Defendants do not deny that the Commission members were aware of the opposition, but they argue that this awareness did not influence their votes.

However, beyond personal knowledge of the controversy, Plaintiffs assert that all voting members of the Commission made unannounced visits to Pathways and made assumptions based on these visits that influenced their decisions. Specifically, Plaintiffs point to Mr. Breck's statement that Pathways' clients would create a "great disturbance" downtown and affect the "peaceful enjoyment of people in the surrounding area" based on his "personal observations" that Pathways clients were "gather[ing] around outside the [Pathways'] building." Pl.Ex. 28, Breck Dep., 146–151; Def. Ex. 30, Transcript of Planning Proceeding, 98. Defendants respond that these visits show that the Commission members were open to learning about

Pathways and that Mr. Breck was just doing his official duty to consider all the factors regarding Pathways' use of the building. Defendants do not dispute Plaintiffs' assertion that Mr. Breck stated his vote was partially based on his belief that Pathways' clients would create a disturbance for townspeople downtown.

In addition, Plaintiffs claim that the outcome of the Commission meeting appeared pre-determined because of two events occurring prior to the Commission decision. First, Mr. Brinsfield, the chair of the Commission, informed Mr. McGloin of his "appeal" rights in the event of an unfavorable Commission decision. Second, immediately before the Commission meeting began, a Town official handed Mr. McGloin a document entitled: "Amendments to the Leonardtown Zoning Ordinance" which contained a description of the Institutional/Office District ("I/O"). Plaintiffs assert that the I/O district is the district that some members of the Commission felt was more appropriate for Pathways rather than the C–G zone.

Defendants respond by saying that the outcome of the meeting was not pre-determined. Initially, they emphasize that Mr. McGloin initiated the call to Mr. Brinsfield on another matter. During the course of that conversation, Mr. Brinsfield, a nonvoting member of the Commission, just happened to mention appeal rights. Moreover, they do not dispute that someone handed Mr. McGloin the zoning amendment but claim that it must have been done as a courtesy to Pathways because the amendment had yet to be published as a part of the zoning code. Defendants also reiterate that the Commission ultimately did not classify Pathways, and thus, did not conclude that it fit within the I/O zone. It is clear from the sequence of events leading up to the Commission decision that Plaintiffs raise an issue of triable fact as to whether the Commission members' discriminatory animus influenced their vote.

Plaintiffs also assert that the Commission departed from its substantive criteria as well as offered shifting rationales for its refusal. First, Plaintiffs claim that traditionally the definitions "office" and "medical office" have been interpreted broadly to grant occupancy permits to businesses.[10] Specifically, Plaintiffs assert that the Commission was excessively preoccupied with facts irrelevant to determining a business' use including the types of customers, their diagnosis, amount of Pathways' staff, traffic, parking, the duration clients stayed, number of vans and sources of referrals. Defendants contend that this is the appropriate inquiry for the Commission to conduct when investigating "use".

Moreover, Pathways offered definitions for the terms "office" and "medical office" which were rejected as too broad by the Commission because they would encompass hospitals and schools which Defendants state are not appropriate for the C–G zone. Defendants argue that Pathways' definition of itself as a "psycho-social day program" did not comport with the notion of an "office" or a "medical office". Furthermore, Mr. Breck stated that Pathways is more like a school than a medical office due to the lack of medical personnel and medication administered. Def. Ex. 30, Meeting Transcript, 99–100. Defendants also argue that Plaintiff's expert, Mr. Gerred, and Mr. McGloin offered contradictory testimony as to Pathways' use. Mr. Gerred said that Pathways could be classified as either a medical office or a clinic whereas Mr. McGloin stated that Pathways was not a clinic. Thus, Defendants contend that they were able to ascertain that Pathways' use was not within the C–G zone. Moreover, Defendants claim that they have not excluded Pathways because they suggested that Pathways reapply for the I/O zone which is also

---

10. Ms. Bonel testified that she gave the definitions a broad interpretation in reviewing applications and that it was possible that Pathways could fit within the designated uses of the C–G zone.

downtown. Def. Ex. 30, Meeting Transcript, 103–104.

The Leonardtown zoning ordinance does not provide definitions for the use classifications within the C–G zone. Moreover, the record reflects that the Commission never articulated definitions for the use designations of "office", "medical office", or "clinic" nor did the Commission define the appropriate use designation for Pathways. Thus, the Commission members were able to ascertain that Pathways did not fit within the C–G zone without defining the use of the organization or even offering definitions of the appropriate use designations for the C–G zone. Given this uncertainty, Plaintiffs have certainly raised a triable issue of fact that the Commission members' votes were in some part due to impermissible discrimination.

At this summary judgment stage, the court finds that Plaintiffs have provided sufficient evidence of the events leading up to the Council and Commission decisions, and departures from the normal · procedures and substantive criteria to raise genuine issues of material fact as to whether actions taken by Defendants were motivated in part by a discriminatory purpose. Accordingly, Defendants' motion for summary judgment as to Plaintiffs' intentional discrimination claim pursuant to the ADA is denied.

### 2. Disparate Impact

■ The ADA also forbids "utilizing standards, criteria, or methods of administration" that disparately impact the disabled, without regard to whether such conduct has a rational basis. § 12112(b)(3)(A); *Smith–Berch, Inc. v. Baltimore Cty.,* 68 F.Supp.2d 602, 621 (D.Md.1999)("Title II prohibits not only intentional discrimination against disabled individuals, but also any policies or practices that have a disparate impact on disabled individuals."). "A cause of action based upon disparate impact arises where facially neutral rules or policies are applied in a way that affects the protected class differently from other

groups." *Bryant Woods Inn,* 911 F.Supp. at 939 (analyzing FHA claim); *Marriott Senior Living Services, Inc. v. Springfield Township,* 78 F.Supp.2d 376, 388 (E.D.Pa. 1999) (finding court's analysis in both FHA and ADA is similar). In *Bryant,* the court described the assessment of a disparate impact claim as follows:

> Hence, the essence of the claim is that a single policy, rule, or custom has different effects upon protected and unprotected classes. Indeed, it is the disparity between a single policy's different effects on different groups which forms the basis of the cause of action. Thus, where only one group or class of persons is affected by a particular decision, there is no disparity in treatment between groups and no "disparate impact."

*Id.*

■ Plaintiffs rely on cases in which a town imposed an extra hearing requirement on plaintiffs because of the disabled population associated with the organization. *See Smith–Berch,* 68 F.Supp.2d at 621 (methadone clinic); *Potomac Group Home v. Montgomery County,* 823 F.Supp. 1285, 1297–99 (D.Md.1993) (group home for the elderly). In the instant case, Plaintiffs do not allege that the Leonardtown zoning system facially · discriminates against them. Moreover, they have failed to identify a facially neutral policy employed by either the Town Council or the Planning and Zoning Commission that has had a discriminatory effect. Rather, Plaintiffs argue that the decisions of the Town Council and the Planning and Zoning Commission demonstrate that the town has a policy of excluding the mentally disabled from downtown. Plaintiffs are not asking for a change in the zoning process, rather they seek a change in the Commission's decision that Pathways does not fit the uses designated in the C–G Zone. *See Bryant Woods Inn,* 911 F.Supp. at 939 (an "isolated decision affecting only the disabled" will not be enough to support a claim of disparate impact). Accordingly,

Plaintiffs have failed to state a cause of action under a disparate impact theory.

### 3. Reasonable Accommodation

#### a. Ripeness

■ Defendants contend that this issue is not ripe for judicial decision because Plaintiffs failed to file for a variance, appeal to the Board of Appeals, or request a zoning text amendment. In deciding whether an issue is ripe, the court looks to "whether the issue is substantively definitive enough to be fit for judicial decision and whether hardship will result from withholding court consideration." *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *modified on other grounds by Califano v. Sanders,* 430 U.S. 99, 104, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977); *Charter Fed. Sav. Bank v. Office of Thrift Supervision,* 976 F.2d 203, 208 (4th Cir.1992). Although the locality must be afforded the opportunity to make the final decision in a zoning matter, the issue is sufficiently concrete for judicial resolution once an accommodation is denied. *Bryant Woods Inn,* 124 F.3d at 601 (finding that Fair Housing Act claim is ripe for judicial decision even though party failed to appeal zoning decision to the appropriate Board of Appeals). Moreover, Title II of the ADA does not contain an administrative exhaustion requirement. *Bledsoe v. Palm Beach County Soil and Water Conservation Dist.,* 133 F.3d 816, 824 (11th Cir.1998). Additionally, after the Planning and Zoning Commission made its decision, Plaintiffs did send letters to Mr. Brinsfield and Mayor Norris requesting reconsideration based on Pathways' need for reasonable accommodation under the ADA which the Town denied. Thus, this court finds that this matter is ripe for judicial resolution.

#### b. Analysis

■ Plaintiffs contend that the Town's denial of its request for an exception to the zoning policy in December 1997 violates the reasonable modification regulation, which mandates that:

A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7). The plain language of this regulation requires that a modification be reasonable and necessary. The reasonable modifications regulation "speaks of 'reasonable modifications' to avoid discrimination, and allows States to resist modifications that entail a 'fundamenta[l] alter[ation]' of the States' services and programs." *Olmstead v. Zirming,* 527 U.S. 581, 603, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999)(citing 28 C.F.R. § 35.130(b)(7)). Plaintiffs assert that unless the accommodation results in a fundamental change in the program it should be granted. By contrast, Defendants assert that first the modification must be proven to be reasonable and necessary before the fundamental alteration defense is considered. This court agrees with Defendants. In *Olmstead,* Justice Ginsburg joined by three other justices, rejected the Eleventh Circuit's strict construction of the reasonable modification requirement stating that the fundamental alteration standard led to goals incompatible with the purposes of the ADA. 527 U.S. at 603, 119 S.Ct. 2176. She went on to explain that "Title II of the ADA is meant to be consistent with § 504 of the Rehabilitation Act which provides for a reasonable accommodation unless the accommodation would impose an undue hardship on the operation of its program." *Id.* at 603, n. 8, 119 S.Ct. 2176. Thus, based on the plain language of the regulation as well as precedent, the proper standard for determining a reasonable accommodation is to first inquire whether it is 1) reasonable and 2) necessary.

■ However, before the court can judge whether the proposed accommodation is reasonable and necessary, the threshold determination of Pathways' use classification must be completed. Plaintiffs contend initially that Pathways fits within the uses designated for the C–G zone and no accommodation is required. Defendants defend the decision to deny Plaintiffs' accommodation by stating that Pathways' use is institutional and thus, fits into the I/O zone located downtown. By contrast, within the same memorandum, Defendants argue that the Commission never defined Pathways' use. Because the Commission was unable to designate Pathways' use during the occupancy permit hearing, Defendants will certainly not be allowed to offer a definition now as a justification for denying Pathways an accommodation.[11] Thus, summary judgment on this claim shall be denied because there remains a genuine issue of triable fact as to Pathways' use designation.

#### 4. Segregation

■ The ADA was enacted in part because Congress found that the isolation and segregation of individuals with disabilities is a serious and pervasive form of discrimination in society. *See* 42 U.S.C. § 12101(a)(2), (5). In *Olmstead*, the Court held that the "unjustified isolation of persons with disabilities is a form of discrimination." 527 U.S. at 600, 119 S.Ct. 2176. Additionally, "[u]nder the ADA, local governments are explicitly prohibited from administering zoning procedures in a manner that subjects persons with disabilities to discrimination on the basis of their disability." *Tsombanidis*, 129 F.Supp.2d at 151; *see also Bay Area Addiction Research and Treatment*, 179 F.3d at 732 (holding that the ADA applies to zoning).

■ Plaintiffs allege that the acts of Defendants have segregated mental health services for people with mental illness without justification. However, Defendants point to two businesses located in downtown Leonardtown that provide services for the mentally disabled: On Our Own of St. Mary's, Inc. and the Mental Health Authority. Paper No. 37, 19 n. 12. This uncontradicted evidence directly refutes Plaintiffs' claim that Leonardtown practices a strict segregationist policy, prohibiting businesses serving the mentally disabled population from locating downtown. Accordingly, summary judgment will be granted on Plaintiffs' ADA claims asserting Defendants have segregated mental health services.

#### B. Federal Constitutional Claims

Plaintiffs have brought claims pursuant to the equal protection and due process clauses of the Fourteenth Amendment. The Fourteenth Amendment has no private right of action, thus, these particular claims for damages against a municipality must be brought pursuant to § 1983. 42 U.S.C. § 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

42 U.S.C. § 1983. Defendants contend because Plaintiffs failed to invoke § 1983 in their complaint, summary judgment should be granted on these claims. The court finds that Plaintiffs' complaint gave Defendants adequate notice of the claims, even if it did not contain a citation to the statute

---

11. Moreover, Plaintiffs assert that Defendants' contention that Pathways could locate downtown by moving to the I/O zone is an empty gesture because all the land within this district is owned by the County government and operated by them for government purposes. Thus, there would be no land available there for Pathways to purchase. Paper No. 32, 56 n. 29.

forming the predicate for the action. *See Smith–Berch,* 68 F.Supp.2d at 625–626.

Defendants also contend that because Plaintiffs have failed to put forward a specific town policy, practice, or custom, summary judgment should be granted with respect to Plaintiffs' constitutional claims. It is well settled that a municipality is only liable under § 1983 if it causes a deprivation of federal rights through an official policy or custom. *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Municipal policy may be found in written ordinances and regulations, *id.* at 690, 98 S.Ct. 2018, in affirmative decisions of individual policymaking officials, *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483–84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), or in omissions on the part of policymaking officials that manifest deliberate indifference to the rights of its citizens, *City of Canton v. Harris,* 489 U.S. at 378, 388–89, 109 S.Ct. 1197 (1989). Moreover, "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Spell v. McDaniel,* 824 F.2d 1380, 1385 (4th Cir.1987). As discussed in great detail, the record contains sufficient evidence to support Plaintiffs' claims that the decisions of the Leonardtown municipal policymakers may have violated their constitutional rights. Accordingly, summary judgment will not be granted on these grounds.

## 1. Equal Protection

 Plaintiffs' equal protection claims do not challenge a specific Town zoning ordinance or regulation but rather assert that Defendants improperly administered the Town's endorsement and zoning classification system as applied to them. The Equal Protection Clause of the Fourteenth Amendment "commands that no State shall deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

To prove that a regulation has been administered or enforced discriminatorily, Plaintiffs must establish that Defendants intended to discriminate:

> The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination.

*Sylvia Development Corp.,* 48 F.3d 810, 819 (4th Cir.1995) (quoting *Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497 (1944)). Moreover, "there is an element of causation that is a necessary part of plaintiff's showing, especially when plaintiff is trying to uncover the motivation of a multi-member decisionmaking body, such as a zoning board." *Id.* at 819 n. 2.

To make this showing, Plaintiffs use the factors delineated in *Arlington Heights* previously discussed *infra* p. 781. Plaintiffs, under an equal protection standard, are not required to prove "that the challenged action rested solely on" discriminatory purposes. *Arlington Heights,* 429 U.S. at 265, 97 S.Ct. 555. Rather, proof that it is a motivating factor shifts the burden to the decisionmaking body to demonstrate that the "same decision would have resulted even had the impermissible purpose not been considered." *Id.* at 270–271 n. 21, 97 S.Ct. 555.

The court must first determine whether a suspect classification or fundamental right is involved. Plaintiffs assert that because Pathways' clients are mentally disabled Defendants did not afford them equal protection of the law. Classifications based on disabled individuals are reviewed under the rational basis standard which requires a rational means to serve a legitimate end. *Cleburne,* 473 U.S. at 441–42, 105 S.Ct. 3249. In *Cleburne,* the town required that the operator of a proposed group home for the mentally retarded ob-

tain a special permit and then denied the permit application. *Id.* The Court struck down the zoning ordinance as it applied to this group home operator, in part, because the City's actions rested on "an irrational prejudice against the mentally retarded." *Id.* at 450, 105 S.Ct. 3249.

As discussed at length earlier in the opinion, the record in this case contains evidence that discriminatory animus existed and may have been a motivating factor in the Town's rescission of the endorsement, repeated denials of an occupancy permit, and the refusal to accommodate Pathways' move downtown. Thus, it is possible for a jury to find that Defendants' actions were irrational and arbitrary because they stemmed from unfounded fears and stereotypes of the mentally disabled.

**2. Substantive Due Process**

 Plaintiffs assert that Defendants violated their substantive due process rights by 1) the Town Council rescinding its endorsement and 2) the repeated denial of its occupancy permit application. To make out a claim that Defendants' actions violated substantive due process, Plaintiffs must show: 1) they had a property interest; 2) Defendants deprived them of this property interest; and 3) that Defendants' actions fall so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency. *Sylvia Dev. Corp.,* 48 F.3d at 827. "[T]he Supreme Court has narrowed the scope of substantive due process protection in the zoning context so that such a claim can survive only if the alleged purpose behind the state action has no conceivable rational relationship to the exercise of the state's traditional police power through zoning." *Id.* (citing *Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974)).

In *Smith–Berch, Inc.,* 68 F.Supp.2d at 627, the court provided the following analysis for determining a property interest, the first prong in the test for a substantive due process violation:

The Fourteenth Amendment itself does not create property interests; rather, they are created and defined by some independent source, such as state law. *See Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Gardner v. City of Baltimore,* 969 F.2d 63, 68 (4th Cir.1992)). To have a property interest in a local zoning permit,

> a person must clearly have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

*Roth,* 408 U.S. at 577, 92 S.Ct. 2701[ ] (quoted in *Gardner,* 969 F.2d at 68). Whether a person possesses a legitimate claim of entitlement to a local zoning permit depends upon whether, under applicable state and local law, the issuing department "lacks all discretion to deny issuance of the permit or to withhold its approval. Any significant discretion conferred upon the local agency defeats the claim of a property interest." *Gardner,* 969 F.2d at 68.

Plaintiffs claim that they were entitled to the town's endorsement because the building they wanted to purchase was located in the designated neighborhood. However, Plaintiffs ignore the fact that these endorsements by their very nature are fundamentally within the Council's discretion. Moreover, Plaintiffs, not Defendants, ultimately decided to abandon the endorsement after the Council invited Pathways' to reapply. Thus, Plaintiffs have not established an entitlement to the Council's endorsement sufficient to support a substantive due process violation.

 As to the denial of the occupancy permit, Plaintiffs rely on *Scott v. Greenville County,* 716 F.2d 1409, 1418 (4th Cir. 1983) to assert that Defendants denied them a permit to which they were entitled. In *Scott,* the real estate developer seeking the permit had already received informal

approval that his proposed use was expressly reflected in the zoning classification required. *Id.* He was then informed by the County Council that the area including his proposed development would be rezoned, and he would no longer be eligible for a permit. *Id.* These facts do not appear in the instant case. Plaintiffs offered the following description for themselves "Offices, psycho-social day program." The psycho-social day program is not a specifically enumerated use for the C–G district defined in the zoning ordinance. Additionally, Plaintiffs never received indication of any kind from Defendants stating that they would be eligible for an occupancy permit within the C–G zone. Thus, the instant case is more similar to the Fourth Circuit cases rejecting Fourteenth Amendment due process claims brought against local governments under § 1983 for refusing to issue zoning permits. *See e.g., Sylvia Dev. Corp.,* 48 F.3d at 826 (no right to special zoning designation authorizing residential subdivision on agricultural land); *Biser v. Town of Bel Air,* 991 F.2d 100, 104 (4th Cir.1993) (no right to special zoning exception authorizing commercial buildings in the residential area); *Gardner,* 969 F.2d at 69–70 (no right to public works agreement authorizing residential subdivision). Accordingly, summary judgment shall be granted with respect to Plaintiffs' substantive due process claims.

### 3. Immunities

Defendants assert that even if possible constitutional violations are found, the individual defendants are entitled to summary judgment on the basis of qualified immunity and that the Town Council members are entitled to legislative immunity.

#### a. Qualified Immunity

■ Under this doctrine, public officials are not liable under federal law for civil damages to the extent that their conduct does not contravene "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Defendants assert that no reasonable public official would have known that rescinding an endorsement would contravene a constitutional right. However, at the July meeting the Mayor very clearly states to the entire Council that there is no legal avenue by which they can oppose Pathways move downtown and they need to be careful. Def. Ex. 4, Videotape of July meeting. Moreover, the law has been clearly established since 1985 that public officials cannot administer a zoning system based on irrational prejudice about the mentally disabled. *See Cleburne,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

The officials are "entitled to summary judgment on the ground of qualified immunity if they can establish that reasonable officials could have believed that their actions were lawful in light of both clearly established law and the information that the officers possessed at the time." *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The court inquires into the "objective legal reasonableness" of the actions; the officers' subjective beliefs are irrelevant. *Id.* at 639, 107 S.Ct. 3034. Based on the existing record, the jury could find that Defendants based their actions on irrational prejudice against the mentally disabled, thus, Defendants are not entitled to a grant of qualified immunity. *See Vathekan v. Prince George's County,* 154 F.3d 173, 180 (4th Cir.1998) ("[S]ummary judgment on qualified immunity grounds is improper as long as there remains any material factual disputes.").

#### b. Legislative Immunity

■ Defendants also assert that the Council members are entitled to legislative immunity because they were acting in their legislative rather than administrative capacity. To facilitate governance, and to avoid the chilling effect personal liability

might impose, particular functions of legislators are cloaked with absolute immunity from suit. *Hollyday v. Rainey*, 964 F.2d 1441, 1443 (4th Cir.1992). However, legislative immunity only acts as a shield against liability when members act in a legislative capacity; administrative or executive types of action are not afforded full protection. *Roberson v. Mullins*, 29 F.3d 132, 134 (4th Cir.1994). Accordingly, legislative immunity attaches when legislators act within a traditional legislative province or adopt prospective legislative-type rules. *Id.* at 134–135. To ascertain whether an act is legislative or administrative, the Fourth Circuit has adopted a two-step analysis focusing on: 1) "the nature of facts used to reach ... decision"; and 2) "the particularity of the impact" of the state action. *Alexander*, 66 F.3d at 66. Under this framework, actions relating to a specific individual are usually defined as administrative, while those that impact the general community or that establish a general policy are legislative in nature. *Id.*

Moreover, officials are not entitled to legislative immunity when seeking to enforce preexisting policy. *Front Royal and Warren County Industrial Park Corp. v. Town of Front Royal, Virginia*, 865 F.2d 77, 79 (4th Cir.1989). In *Front Royal*, the legislators denied plaintiff's request for sewer service and the court held that those decisions "had to do with zoning enforcement rather than rule making" and thus, the legislators were not entitled to legislative immunity. *Id.; see also Scott*, 716 F.2d at 1423 (county council not entitled to legislative immunity after they withheld a building permit).

The Town Council of Leonardtown made a case-specific determination to rescind Pathways' endorsement. It is undisputed that this vote concerned only Pathways' and did not create a new general community policy. Much like in *Front Royal* and *Scott*, the endorsement vote was an administrative rather than legislative action in furtherance of the already existing general policy of downtown neighborhood revitalization. Consequently, the Town Council members will be denied a grant of legislative immunity.

## IV. *Conclusion*

For the foregoing reasons, Defendants' motion for summary judgment will be GRANTED in part and DENIED in part.

A separate Order will be entered.

## · *ORDER*

For the reasons stated in the foregoing Memorandum Opinion, it is this _____ day of March, 2001, by the United States District Court for the District of Maryland, ORDERED that:

1. Defendants' motion for summary judgment BE, and the same hereby IS, GRANTED in part and DENIED in part;

2. Plaintiffs' Rehabilitation Act Claim BE, and the same hereby IS, DISMISSED;

3. Plaintiffs' ADA claims against Robert Guyther, J. Harry Norris, Ruth Proffitt, Bernard Delahay, Susan Erichsen, Daniel Muchow, Walter Wise, Ned Brinsfield, Charlie Breck, Joan Holmes, and Charles Faunce BE, and the same hereby ARE, DISMISSED;

3. Judgment BE, and the same hereby IS, ENTERED in favor of Defendants and against Plaintiffs on the ADA disparate impact and segregation claims and on the § 1983 due process claim;

4. A telephone conference will be held on *April 12, 2001 at 9:00 a.m.*. Counsel for Plaintiffs is directed to arrange and initiate the call to counsel for Defendants and the court; and

5. The Clerk will transmit copies of the Memorandum Opinion and this Order to counsel for the parties.